May it please the court, coming from a state where the bar is known for its collegiality, to appear before a court that is well known for its collegiality, it is with no joy that I present this case. I represent the widow of Gary Fox, who, when he was 50 years old, had a hearing to try and get black lung benefits so that he could get out of the coal mines and exposure to dust. At the time, Elk Run's counsel had information which they knew established that Mr. Fox was already suffering from pulmonary massive fibrosis, complicated pneumoconiosis, a progressive disease that would not get better. They knew that because they had the reports of two pathologists. Now, one can say that there are often many different opinions from experts, but that was not true in this case. It is important to understand that the ALJ in this case knew, and we've cited cases that give the history of what went on here, that the ALJ in this case knew that the coal company's counsel had access to panels of experts that he and others had seen in many cases. And they knew that if counsel wanted to have the pathology slides viewed by pathologists, they had any number of pathology experts that they called upon in many cases to review those pathology slides. And the ALJ knew and understood that if the company wanted through its counsel to have these reviewed, it could do so. And yet it shows up at the hearing in the end of 2000 with no pathologist except for Dr. Cole, who, and this is important, the records that are available of this case, the employer never, never. Did Dr. Cole actually testify? No. He was just the pulmonologist, wasn't he? That's what happened, Your Honor. There's no evidence even in the record that Dr. Cole was consulted to see what his opinion really meant. The opinion, as I'm sure the Court is aware from the briefs, was originally provided in an attempt to rule out cancer. And what is problematic and of concern to the ALJ was that Cole was less qualified, less credentialed than Dr. Noya. Well, I mean, perhaps it is, perhaps it's not. I don't think what the company did here was admirable by any stretch of the imagination. But the question I have is should the courts really get into how a party handles its expert witnesses? Most of the time the answer would be absolutely not. But there are occasions that go well beyond that. This is not simply a question of how they handled their expert witnesses. This is a case where the ALJ... Well, sure it is, because the expert witnesses here were the pulmonologists. And if we go down this road, would we put a burden on the courts to inquire how each and every party handles its experts, with what they did provide them and what they didn't provide them? I mean, historically that's been left to the adversary process and to the processes of discovery and to the processes of impeachment. And to saddle on the courts the duty to make some sort of inquiry into what a party does or doesn't disclose to its experts. Judge Wilkinson, as a litigator who deals with experts all the time, I, in general, agree and understand what you're saying. But I think there are exceptions and have to be exceptions to that rule. If I, Your Honor, go to a number of experts and am satisfied by those experts that I have no case, and worse, in this case, not only do I have no case, but by putting on what I know to be a false case... But, no, that doesn't go that far. But what other cases have found a duty under law, this is a matter of law, to disclose to non-testifying experts, to disclose non-testifying experts to testifying experts? Let me... I don't believe that's the... I'm sorry, I didn't mean to interrupt you, Your Honor. Does that go that far? Your Honor, that's not how I would... the answer would be not to my knowledge, but that's not how I would phrase that question. That's not how I would phrase the question. I think it is unfortunate that the question has been phrased that way. To me, the issue is not whether or not there is generally a duty to disclose non-testifying experts. To me, the question is when an attorney knows that he has no case, when he knows... The attorneys, it's never been argued, at least in the history of this case, that the attorneys weren't on notice from their own experts that this man had PMF. When they know that, Your Honor, I guess it's akin to a Rule 11 problem. If I, as a plaintiff's attorney, file a case knowing that the experts... That brings up my point. Your Honor, why isn't something like this handled under Rule 11 rather than stretching the doctrine of fraud on the court? I mean, aren't there other ways to handle this rather than this particular vehicle? Your Honor, it's important to recall how this case came up. This was a pro se claimant. This was a pro se claimant that this was done to, sending him back into the mines where six years later he came out needing a lung transplant and died just a few years later in 2009 at the age of 56. It only came up because he got sicker and sicker and sicker and filed a second black lung claim where he was represented by counsel who figured out what happened in the original case. So there was no Rule 11 to bring at that point. What was important to do at that point was to establish the wrongdoing that went on here. And it's not simply this case where it happened. I think the court can take notice of the fact that one of the attorneys involved in this case, Mr. Smoot, was also disciplined by the West Virginia Supreme Court of Appeals for somewhat similar conduct in dealing with experts. This was a serious problem in the black lung program that the ALJs knew and understood. And let me emphasize, to me, Judge Wilkinson, this is not a case about requiring attorneys to disclose experts that may disagree with what they're doing. This is a very limited case that deals with the issue of when an attorney is on notice that he has no case. And, I mean, I can go into that further why I take the position they knew they had no case. It's developed in the briefs. Isn't something like Rule 11 aimed directly at that problem? But how do you- Fraud on the court, doctor. My problem is that it seems to me, you know, sanctions, or if you file a baseless complaint or something that's sanctionable under Rule 11, my problem is the fraud on the court vehicle that you've chosen. Because, you know, the Supreme- it's important not to sort of just mix and mingle doctrines here and there. It's important to keep them straight. And you've got both our own precedent in Great Coastal and the Supreme Court's precedent in Hazel Atlas. And the Supreme Court in Hazel Atlas says you have to have a deliberately planned and carefully executed scheme to defraud the judicial system. And then in Great Coastal you had far more egregious conduct than here. And, you know, our court said there's no fraud on the court. So I just don't understand how this fits within the parameters of fraud on the court and how we avoid doing violence to Great Coastal and Hazel Atlas. I'm writing, Your Honor, a very narrow and tight opinion. Let me respond to that. This is not-Great Coastal was not worse than this, Your Honor. Great Coastal was employees of a party who were perjuring themselves and doing things with the evidence. What Great Coastal did not involve was the conduct of attorneys. When we get to the conduct of attorneys, that's one of the things that distinguishes this case from Great Coastal and falls within the parameters of Hazel Atlas. We did not bring this lightly. In Great Coastal there was an outright fabrication. But not by attorneys. Not by attorneys. I believe that courts have a duty to recognize, and I think Hazel Atlas suggests it, that we reach another level of wrongdoing when there are attorneys involved. Well, let me ask you this. Did you articulate the rule that you want us to adopt? I want you to adopt a very narrow rule, Your Honor, that indicates in a case that I think it would be upholding the fact that in a case where there was good reason to believe that the attorneys representing the coal company had- First of all, are you going to limit this to coal cases? No, no, no, no, no, no. We could. What rule did you want us to adopt? What I'm concerned about is how broad it is. I think the reason I said coal cases is because it came up in the coal context. What's the rule that you want us to write down that will control these situations from now? The rule is in the rare case where there is substantial reason to believe that there has been misrepresentation of what the evidence is as known by the attorneys, in this case ALJ, can order the disclosure of expert reports, and if it's determined, that's rule one, because I think there's two separate issues. One is the issue of when an ALJ under 18.14 of the- You've got all kinds of weasel words in your test, like the rare case and substantial reason to believe. That's not particularly confining. I mean, you're almost creating a sort of civil Brady rule, aren't you? No. You have to turn over either to the court or to the opposing party or something exculpatory or favorable evidence to the other side. I mean, are we on a civil Brady kind of kick? No. I think all we're on is saying that when attorneys knowingly present a false case and let's remember the context here. There's a whole history in the Black Lung Program of the employers being able to out-resource claimants, many of whom appear pro se because they can't get lawyers. When attorneys in that context know they're putting on a case, your Honor, remember- Is that a problem with how the program is structured that you should bring up before Congress? No, I think- Well, I believe it's a problem with how attorneys behave in the system. I believe it's definitely a problem about how attorneys behave in the system. Normally if you put on an expert that isn't aware of the full landscape, the party is running a risk, number one, of having the expert decimated on cross-examination and impeached by other ways and running a risk of maybe discovery violations and all kinds of things. But don't we generally rely on the adversary system to police this problem? We do, but I don't believe that that excuses this kind of misconduct. I'm not sure if my clock is right, how much time I have or if I- It's right. Am I done? Can I answer that question, Your Honor? Judge Wilkinson, I think it's important to remember what went on in this case. Why don't you bring this up on rebuttal, okay? You've got some time remaining. Let's hear from him. Gentlemen, may it please the Court, I think I can state our best understanding of what we believe Mr. Carlin wants this Court to rule. As succinctly as I can state it, what he is asking for is the Court to enter a decision that essentially says there is an absolute duty on the employer in a federal black lung proceeding to submit or divulge the reports of its consulting non-testifying expert witnesses to its testifying expert witnesses to the pro se claimant or the claimant's attorney if he has one and to the administrative law judge. Further, that this absolute duty, if breached, constitutes a fraud on the Court and then to retroactively apply that absolute duty to all claims that have been previously decided,  It's a sin of omission. I'm sorry, sir? It's a sin of omission. The sin, I guess, of omission, yes, Your Honor. But the thread that runs through all of this and the purpose for the cross appeal that we were filed, and Judge Wilkinson, you hit the nail directly on the head immediately, we are talking here about an adversarial process and we are talking about how an attorney, a client, handles non-testifying expert witnesses. In this case, we had two non-testifying expert witnesses and by the way, Dr. Coe has been briefly discussed here. I don't want the Court to be left with the impression that Dr. Coe was somebody who stayed in the Holiday Inn Express the night before he did this examination. He was a practicing pathologist, a treating pathologist, in Beckley, West Virginia, who saw coal miners, gentlemen like Mr. Fox, every day in his practice and he read the pathology slides and he gave a very reasoned, two or three page opinion, if you will, or description of what he found with respect to those slides, which was essentially an inflammatory pseudo-tumor. So Dr. Coe, a very qualified pathologist, rendered his opinion. Two additional opinions were obtained from, as it turned out, non-testifying experts. So the question here and the problem here, and it's a problem that not only occurred with the Administrative Law Judge in Fox and was affirmed by the Benefits Review Board in Fox, is the misunderstanding, it's the best way I can put it, misinterpretation by the Board, the Benefits Review Board, of the Work Product Doctrine and how it applies. And I can explain in excruciating detail how that misapplication and misunderstanding has presented itself, but let me begin simply by saying if we don't find a fraud on the court, we don't have to reach across the field, do we? Why would we have to get into all that? To follow up on Judge Floyd's point, if we find that this doesn't fit within fraud on the court, do we need to get, I don't understand why we would need to get into the work product matter. Well, and I don't mean the court to take this in the wrong way. It seems to me that the fraud on the court issue is an easy one, as easy really as the Benefits Review Board said it was in its decision overruling the Administrative Law Judge. It's not a hard question. But the misinterpretation, the misunderstanding of the Work Product Doctrine still exists. The only pronouncement from any circuit is this circuit in the Elm Grove decision, and it's very, very tangential, and it's been misinterpreted in our view. I'm not understanding your answer. If we affirm the Board's decision regarding fraud on the court, does it moot your appeal? I don't believe it does, Your Honor, because the core problem, the key misruling, if you will, that underlies all of this, that underlies the fraud on the court decision, still exists, and it's this work product. But you sound like you're having a problem in practice or something, and you would like for us to get into it, but I don't understand any need to get into it, particularly after you said that the fraud on the court issue just under the Supreme Court's decision in Hazel Atlas and our own decision in Great Coastal is very straightforward. Well, Mr. Carlin indicated in his argument that this, quote, problem is going to continue to come up. Well, but he's not, you know, what he indicates is not, you know, that's not controlling.  And that is whether there's a, whether the courts are going to get into the general matter of how a party handles its expert witnesses and what it supplies and what it doesn't supply. And the problem we have with that is it, that's a slippery slope if ever there was one. And why isn't, you know, end of story? Well, it's not a very slippery slope in this instance, I would suggest, Your Honor. Again, you have, this circuit has touched that issue. It has gotten into the issue of work product, and it has gotten into the issue of what is discoverable under work product in the Elm Grove decision, the only circuit to have done so. What is presented in this case, and as was stated in the Elm Grove decision, a question about the work product doctrine and what it protects or what it doesn't is a question of law. And it's an important question of law. And it underlies and has been underlying certainly since Elm Grove every, almost every federal Blackland case certainly that we have been involved in. And this cancer, if you will, and pardon the bad pun, but this underlies this decision, this mistake, this error, this misinterpretation is the reason that we are here. It is the whole reason that we are in front of this court today. Fraud on the court, the allegations about fraud on the court, all of the other pejorative and inflammatory statements that are made in the claim with respect to fraud on the court, many of them reiterated by the administrative law judge in this instance, all stem from the misunderstanding with respect to work product. Now, I will say that going forward, the new rules that have been proposed by the Department of Labor to change the text of 29 CFR 18.14, which is the scope of discovery governing regulatory provision with respect to this issue, the changes that have just been proposed as of the end of 2012 may, if interpreted correctly, aid this situation going forward. But it does not change the problem that is faced with respect to current litigation. And again, the rule that I suggest to you, Mr. Carlin, would want you to adopt, and that would be the interpretation of it, is that you apply this absolute duty that is completely inimical to the work product doctrine, and you apply this retroactively, and we go back and we try to- You say you were trying to protect the work product privilege of these other non-testifying experts, the other two pathologists that you didn't reveal to the four pulmonologists. How does non-disclosure to the four pulmonologists of the two other pathology reports, how does that protect the work product privilege? And I'm talking about- You're talking about the work product privileges with respect to Drs. Nye and Caffrey, right? Correct, John. Okay. And just because you're dying to get this point out. So how does it protect- How does not disclosing the Caffrey and Nye reports to the pulmonologists protect the work product privilege? Well, it's the essence of the work product privilege, Your Honor. And again, your first question- If you mention this, if you mention Dr. Nye and Dr. Caffrey to the four pulmonologists, then you lose any work product privilege. Absolutely, Your Honor. Rule number one, litigation 101. Anything you give to a testifying expert, and this is what Elm Grove basically said, if a testifying expert has it, it's an open book. And that's the first thing you teach any law student that comes to you at a law school, if you're going to be a litigator, is whatever you've got, if you want it disclosed, if you want it in the record, if you want the other side to have it and to use it in any way they can, if you want it to be a part of the case, then disclose it to your testifying expert. And that's the beginning and the ending. All of the points that Mr. Carlin seeks to make begin and end with that, with those two reports and with them obtaining them through the discovery process imperfectly understood, as is indicated by the decisions that Your Honors, I'm sure, have read, both from the administrative law judge and from the Benefits Review Board. I mean, they simply – But, you know, I mean, your actions are at least open to the interpretation that you didn't want to bring forward or disclose to the pulmonologist the Nye and Caffrey reports because the pulmonologist might have looked, didn't have anything to do with work product. The pulmonologist may have looked at the Nye and Caffrey report and it may have changed their testimony and you didn't want that to happen. And so, I mean, I realize that you're talking about work product privilege and you're seeking to claim the high ground, but as a practical matter, is that really what's at play in these particular facts or was it that you didn't want the pulmonologist to give anything less than conclusive testimony on your side? Well, there's a lot of all of that, Your Honor. I mean, obviously, any lawyer who's handling a matter in an adversarial proceeding does want their expert witnesses who are testifying in the case to give the strongest possible opinion. Now, I don't want to leave my initial time here without there's a lot of discussion and talking about Nye and Caffrey. I don't know if Your Honors have read those reports or not, but their characterization, the way they've been discussed in this case, in the briefing and in the oral statements, is inaccurate. They are described as being reports that are absolute certain diagnoses, if you will, of complicated co-worker's pneumoconiosis. They are not. If the court has not, I would ask the court to go to the record in this case. You're a good deal more ambiguous. Oh, absolutely, Your Honor. Pages 465 for Nye and 466 through 68 for Caffrey. And I can very quickly tell you Dr. Nye renders no opinion. He discusses what he saw, and a knowledgeable reader would see that what was described in these pathology slides is a complicated tumor that probably consists of a lot of different parts, much of it inflammatory, if not most of it inflammatory, pseudotumor. His conclusion, if you will, is if, and I emphasize the word if, this is 465 in the record, if his presurgical findings met the legal definition of complicated co-worker's pneumoconiosis, the surgeons have removed it. He does not opine that it met those requirements. He said if it did, then the surgeons have removed it. In short, it has had a surgical cure. Will findings that meet the criteria of complicated CWP return? There is no way of knowing. That's expert Nye, again in a long, fairly long, one page, but detailed report, no opinion reached. In Caffrey's case, again a lengthy report that discusses in detail what he sees on the slides, and he used different lighting and stuff like that, but he says at the end, Coe has made a diagnosis of benign mesenchymal lesion. He notes that it is an inflammatory pseudotumor and lists numerous symptoms. It is possible that this could be a fibrous histiocytoma, but in view of the histology of this lesion, the patient's history, and the x-ray findings, I believe that this lesion most likely represents complicated pneumoconiosis. So we have Dr. Coe, we have Dr. Nye, and we have Dr. Caffrey, but not some clear-cut thing. And we all have to recall this is expert opinions are not facts. And the black lung program is not a diagnostic or a treatment program. The point at the end of the day is, whatever it is, whatever it isn't, it falls well short of fraud, of deliberate fraud on the court. Yes, Your Honor. But that, and my time has expired. Thank you. You have some time remaining later on. Mr. Carlin. I'm not asking, as Mr. Ramsch suggests, that parties be required to disclose all their experts. I want to emphasize, because I'm concerned not just about the outcome, but it's how the opinion is written, that there are serious problems in the black lung system with how some attorneys litigate cases. That can be seen from this case and the Smoot case. And if I can just briefly explain what the difference between my perception of the case and Mr. Ramsch's perception of the case is. Can I just say preliminarily that it seems that both you and Mr. Ramsch want us to straighten out all of the problems that exist in black lung litigation. I mean, you in your practice and Mr. Ramsch in his practice run up against certain problems. You want us to straighten all these problems in black lung litigation out. And how can we do that? I mean, the difficulties such as they are, don't lend themselves to resolution in a single case. And most of them probably belong within the purview of Congress. Your Honor, my concern is that you not write an opinion that encourages the continuation of this. Let me emphasize what happened here. This is not about the failure of the attorneys in this case to disclose the particular reports. Noye's report, as read by the ALJ and those familiar with it, is understood to be a complicated diagnosis. Although it may not be clear to a lay reader. But let me emphasize, these individual attorneys had unlimited resources to hire experts. They hired four pulmonologists. They hired multiple radiologists. But they didn't hire a single pathologist. Now, they have lists of pathologists that they go to. How can we get into the matter of who they hired and who they didn't and how a side should be spending its money and its resources and whether they should hire pulmonologists versus pathologists? I mean, what are we supposed to do? You know, sit up here and tell a party how to litigate its case? No, absolutely not. You're not. This is the ALJ. You're complaining about the relative abundance of pulmonologists and the relative scarcity of pathologists and the rest and the relative imbalance of resources. And I don't know, Your Honor, if I can explain. That's not what I'm saying. What I'm saying is that when you're in the system and you have to we're talking about the discretion of the ALJ here. The ALJ knows the system. The ALJ looks at that, and he knows that if they haven't retained a pulmonologist, it's because they know they can't find one. That's the problem and the core of the case. Because once they couldn't find a pulmonologist, and there's an inference from that that the ALJ drew, that they knew that this man had a progressive disease. They not only knew they couldn't find a pulmonologist, but then they took the Cole report and they gave it to each pulmonologist and they even went into depositions and they asked questions like Suppose they had disclosed to the pulmonologist the Caffrey and Nye report. Would they have lost the status of those reports? Would they no longer be covered under the work product doctrine? Once they disclosed the reports, yes. But to me, again, it They would no longer be covered. Well, all right. Was it a fair thing for them to want to protect work product? Your Honor, I hope I guess I'm not making my point very clearly. The issue is not whether you disclose reports or not. The issue is when you go forward knowing you don't have a case. If I go forward in a case knowing I don't have a case, I expect something bad to happen to me. What we're trying to say is the issue is not whether they disclose a report or not disclose a report. That gets back to the other question is aren't there different ways of handling this? If you file, for example, if you don't have a case and you file a baseless complaint, Rule 11 speaks to that. And there are all kinds of statutory provisions that speak to that. But what you've latched on is a sort of a kind of a common law doctrine of fraud on the court where the Supreme Court and this court have set the bar very, very high. And part of the problem here is the vehicle that you have chosen because you've run smack into Great Coastal and Hazel Atlas. I mean, that's the basic difficulty is you've chosen to proceed under a test that provides about as high a bar as you can imagine. I understand that, Your Honor. When that was filed, that was the only option, the only place that counsel at that time sought to go to raise this issue. But please let me emphasize, for the opinion, whatever you write. What about an ordinary Rule 60B motion? That's only one year. I mean, I take it the court would have an easier time if we were just talking fraud as opposed to fraud on the court. A 60B motion, this is a fraud issue is only one year out. This was more than one year out, so therefore it had to be fraud on the court. That's why it was filed. But please, whatever happens in this case, please understand that our complaint is not simply that you have to disclose all your expert reports. That would be a horrible decision. I would not request it. But there are particular facts in this case that an ALJ knowledgeable about the Black Lung Program, reading the NOIA and CAFRI reports with the knowledge of somebody who has knowledge of the program, believed. Judge Craxwell asked at the beginning, isn't this a sin of omission? No. It's a sin of commission. Because what they did was once they knew that they didn't have a – can I finish the answer to that question, Your Honor? I'm about to run out of time. Once the attorneys knew that they could not find a pathologist on their own who would back their claim, they went to a pathologist who had been reading slides to rule out cancer. And according to the record, there's no evidence. They've never claimed they ever went to him to find out if he meant to rule out black lung when ruling out cancer. They then take that report and they give it to their pulmonologist and they tell them that's the evidence. You have one of their pulmonologists whose report says there is no evidence, pathology evidence. I've seen all the reports, which is not true. You have them going to Dr. Castle, a pulmonologist, and taking his deposition. And the attorneys, knowing that the true pathology evidence will not support him, asks him the question, do you think Dr. Rasmussen – recall Dr. Rasmussen is the attorney – excuse me, is the doctor who originally diagnosed pneumoconiosis. They say, wouldn't Dr. – would this have changed Dr. Rasmussen's report, do you think, if he had known that the pathology evidence ruled out pneumoconiosis? And then, of course, Mr. Castle replies, of course, I think it would have changed it. And then you get the ALJ decision in the 2000 hearing coming out and quoting Dr. Castle on the point that if Dr. Rasmussen – Tell us an omission, not providing the information that you say should have been provided. Well, I think it ratchets it up when you go into a deposition and you use it affirmatively. It's either omission or commission, one of the two. Well, I think when you elicit testimony based on what you know to be a faulty pathology report, I would call that commission, Your Honor. I don't want to get into a technical term, but that's more than it. But our point, just to emphasize – Thank you, Mr. Carlin. Thank you. Mr. Inch. If we find that there was no fraud in the court and addressed the work of pathology privilege, it would be nothing more than dicta. And dicta sometimes is a mischievous thing, I would say. Dicta, I guess, can be mischievous, Your Honor. I've seen dicta in both categories, as I imagine Your Honor has as well. Some dicta is nice and we like it, depending on the case. Other dicta maybe we don't like very much, so we just call it dicta and try to make sure it's disregarded. I don't think it would be dicta in this case, Your Honor. If you look at the cross appeal, and maybe partly in response to your question, Judge Wilkinson, earlier, if one can be permitted to look at the cross appeal almost standing on its own. This issue, you're right, we've been trying to get it before the court again for a long time, but it has independent legs in this case. And I can tell you again and wish to say one more time, it's an important, crucial element in federal black loan litigation. I understand, but you just said that some of the DOL regulations were going to address the problem you're talking about going forward. So why should we undertake a reform effort from the bench? If adopted and if interpreted correctly by the Benefits Review Board, it may help, Your Honor. Why should we leave it up to the regulators who understand the ins and outs of a program that they deal with every day? I mean, I share Judge Floyd's concern. You know, it's a tricky area because it's very specialized, both medically, it's specialized and also in terms of the ins and outs of the legal practice, it's specialized. It may just be that, you know, a little knowledge is a dangerous thing. And why should we wade into it? It's just tricky. Well, at minimum, Your Honor, as we were preparing to confront this appeal, it seems and appears to us, and I would submit to the court, that it's very, very difficult, Judge Floyd, to decide the no fraud on the court without making some comment about the work product doctrine and that protection. For example, I would say to the court, if treating non-testifying experts as they were treated in this case can ever be argued to constitute fraud on the court, and I submit it can't, then any case in this country it can be argued as constituting fraud on the court because it's happening in litigation every day in every jurisdiction. They're being handled exactly that way. If I may, by way of response to a couple of points Mr. Carlin made, first of all, I will say again what lawyers had in front of them after getting Nye and Caffrey's reports were a report from the treating pathologist that was very clear, an ambiguous report from Nye, and a little bit stronger report from Caffrey. That's what we were looking at, and we picked the best evidence that was there, and we dealt with our non-testifying experts as you always do. Dr. Coe was the treating physician. He was the treating physician. And that's the one you disclosed, the treating physician. Absolutely, Your Honor. And let me say again, work product runs, it's the thread that ties all of this together, and it is going to keep happening, and that's why we have cross-appealed to ask this court to make a simple pronouncement, Judge Wilkinson. I mean, this is not a big, complicated, detailed issue. Work product doctrine applies. Work and protecting it in the litigation and defending it in a piece of adversarial litigation cannot, cannot, even rise to the level of discussing it as fraud on the court. That's what we request. Thank you, Mr. Ames. We'll come down and recounsel and then go into our next case.
judges: William B. Traxler Jr., J. Harvie Wilkinson III, Henry F. Floyd